**Harold BUSTER, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000257–MR.

Supreme Court of Kentucky.

Oct. 25, 2012.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Susan Roncarti Lenz, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant Harold Buster was convicted of multiple counts of first-degree sexual abuse and sentenced to twenty years' imprisonment. On appeal, he challenges the adequacy of the notice of the charges against him, the trial court's failure to grant a directed verdict, and the trial court's attempt to retain jurisdiction to impose court costs and a partial public-defender fee in the future. This Court affirms the convictions and sentence, but reverses the trial court's decision regarding costs and fees and remands for further proceedings.

## I. Background

For a period of two years, Appellant Harold Buster lived in Munfordville, Kentucky, where he spent a lot of time at the home of Rodney Hayes, whom Appellant had known since he was young. Rodney Hayes lived across the street from his second cousin, Vanessa Tucker, who lived with her husband and two daughters, K.A.T. and K.S.T., who were born in 1988 and 1989, respectively. Hayes babysat the two girls at his home almost every week-end for a couple of years until he moved in the mid–1990s. At that time, Kenny and Patricia Buster began babysitting the girls and continued to do so almost every weekend until 1999 or 2000. Appellant, who is Kenny Buster's brother, visited frequently while the girls were staying at Kenny and Patricia's home and occasionally stayed overnight.

In October 2009, police began investigating Kenny and Patricia Buster because of a sexual assault allegation from an unnamed juvenile. During the course of the investigation the investigating officer interviewed the two girls, who alleged that Appellant had had sexual contact with them. Based on this information, the officer obtained an arrest warrant for Appellant stating the charge and identifying the victims only by the initials "K.A.T." and "K.S.T." Appellant was arrested on November 24, 2009, and charged with two counts of sexual abuse in the first degree.

On February 16, 2010, the grand jury indicted Appellant for more than thirty sex crimes, including rape, complicity to rape, and multiple instances of sexual abuse. He was indicted for three counts of sexual abuse in the first degree as to "K.S.T." and twenty-eight counts of sexual abuse in the first degree as to "K.A.T." In January 2011, the Commonwealth dropped the complicity-to-rape charge.

On the morning trial began, February 22, 2011, the Commonwealth dropped the remaining rape charge and all but five counts of first-degree sexual abuse, three against K.A.T. and two against K.S.T. The jury convicted Appellant of all counts, and he was sentenced according to the jury's recommendation to four years on each count to run consecutively for a total of twenty years.

This appeal followed as a matter of right to this Court. *See* Ky. Const. § 110(2)(b).

Additional factual background will be provided below.

## II. Analysis

Appellant raises three issues on appeal. First, he complains that the Commonwealth failed to give him adequate notice of the charges against him, which violated his due process rights. Second, he claims the trial court should have granted a directed verdict in his favor. Third, he claims the trial court erred in ordering that he be returned to court after serving his sentence for possible assessment of court costs and a public-defender fee.

### A. Appellant was provided due process because he had fair notice of the charges against him.

Appellant's principal argument is that the prosecutor in this case failed to give him adequate notice of the charges against him, both in the indictment and in discovery responses to several motions for a bill of particulars. Appellant claims that he first learned of the precise date, time, and location of the offenses, and the identity of the victims, during the middle of trial when the victims testified. This, he claims, violated his due process rights.

Appellant was originally indicted on two counts of first-degree rape and more than thirty counts of first-degree sexual abuse. The two rape counts in the indictment did not list a victim. Instead, they simply described the victim as being a person under the age of twelve. The sexual-abuse charges were more specific, in that they identified the victims by their initials, but they too failed to identify the victims fully. Two of these charges listed the victim as "K.S.T.," and described her as having been

a person under the age of twelve. The remaining thirty charges listed the victim as "K.A.T.," and also described her as having been a person under the age of twelve. Except for the initials used in the two sets of abuse charges, all the sex-abuse counts of the indictment are identical. The time period listed in all the charges was "between 1990 and 1998."

In April 2010, after an order on a motion for a bill of particulars, the prosecutor filed a response listing the two victims by their first and last names.[1] Since they share the same first and last initials, this did not clarify which charge applied to which victim.

Attached to the response, however, was a set of pre-indictment police reports about the incidents. These reports identify the victims by name, including middle initials. They also list the victims' addresses, phone numbers, dates of birth, Social Security numbers, eye and hair color, and height and weight. They also include narrative descriptions of the results of the police investigation.

Two of these reports identify a single victim with the middle initial "A." The descriptions of this victim's height and weight are slightly inconsistent between the two reports. Based on the middle initial, this victim was K.A.T. The first page of both reports also lists the location of the offenses as Walton Lane in Munfordville, Kentucky.

The first report lists the charges as twenty counts of first-degree sexual abuse. The narrative description on this report states that K.A.T. and her younger sister used to be babysat by Patricia and Kenny

---

1. A written motion does not appear in the record, but the written response does. The response states that a motion was made and granted by the trial court. Presumably, this was an oral motion made at arraignment.

Buster's brief, despite describing in detail the rest of the discovery process, fails to even mention this motion or the prosecution's response to it.

Buster. The narrative also states that every night Harold Buster would wake K.A.T. up by touching her sexually with his fingers or penis, or by penetrating her with his penis; and that other times she was awoken by her sister crying as he performed the same acts on her sister. The narrative section of the report does not list a time period when the crimes occurred, though the first page of the report lists the "incident date/time" as 1990 to 2009 and describes this as an estimate.

The second report lists the charges as two counts of first-degree rape. The narrative attached to this report also states that Patricia and Kenny Buster babysat K.A.T. as a child. It also states that when she was at their house, Appellant, described as the brother of her baby sitter, would wake her up at night by putting his penis in her face or inside her and having sex with her. The report also stated that Appellant put his fingers inside K.A.T., and that she would pretend to be asleep at times, at which point Buster would perform the same acts on her sister, who would cry. The narrative describes the time period of the crimes as "sometime between 1990 & 1998," but the first page lists the "incident date/time" as 1995 to 1998, which again is described as an estimate.

A third report identifies two victims. The first victim listed is again K.A.T.; this report again lists her height and weight slightly inconsistently with the other reports. The second victim named and described in the report has the middle initial "S." Based on the middle initial, this second victim was K.S.T. The report lists the charged crimes as two counts of first-degree sexual abuse, and the location of the crimes as River Road in Munfordville.

The narrative description attached to this third report states that Kenny and Patricia Buster babysat both K.A.T. and K.S.T. in the early 1990s. It notes that both girls claimed to have been sexually abused on several occasions, and that the abuse occurred every weekend for two to three years. According to the report, K.A.T. described the abuse as occurring twenty to thirty times and consisting of Appellant waking her up at night with his penis in her face or going inside her and penetrating her with his penis and fingers. The report states that Patricia Buster described Appellant as reaching inside K.A.T.'s panties and touching her. Finally, the report states that K.S.T. said that Appellant had touched and fondled her private area two times. The narrative section of the report lists the time period when the crimes occurred as the "early 90's," though the first page of the report lists the "incident date/time" as 1995 to 1998, which again is described as an estimate.

Apparently there was still some confusion after this discovery response because Appellant joined the motion for a bill of particulars of one of his co-defendants four months later, in August 2010. In September 2010, the Commonwealth responded to the motion and stated the specific names of the two girls once again. In this response, the Commonwealth stated: "The allegations set forth in the indictment all took place [every weekend during the summer (end of May through 1st of August), 1996–2000, as well as a few other weekends during the year (with last event and last visit happening in mid July 2000)], with both girls saying that they were raped, sodomized and/or sexually abused every weekend they were there at least once and often two or three times." The Commonwealth also stated that the witnesses "both continue to attempt to be more specific as to the dates and times." Although this motion for a bill of particulars is also not included in the record, it

appears that it requested that the Commonwealth provide the specific dates and locations that the offenses occurred. The Commonwealth replied that because of the victims' ages at the time of the offenses and the length of time that had elapsed "breaking down the allegations to a specific date and time ... has proven nearly impossible." Additionally, the Commonwealth stated that interviews with the victims were ongoing and that it would provide more information to the defendants as it became available.

Still unsatisfied with the information provided by the Commonwealth, Appellant filed a third motion for a bill of particulars on October 28, 2010, asking the Commonwealth to provide: (1) the name of the victim in Count 1 of the indictment (first-degree rape); (2) the location of the alleged rape in Count 1; (3) the names and addresses of any witnesses to the alleged rape; (4) the name or names of the victims in Counts 2 through 34 of the indictment and the exact location and date wherein each of the crimes took place; and (5) any witnesses to the sexual abuse in Counts 3 through 34. On January 24, 2011, the Commonwealth provided all information requested by Buster. On January 28, 2011, the day that trial was supposed to begin, the Commonwealth supplemented its response and provided more detailed information, including a more specific date range and details of the sexual abuse, based on interviews conducted with the victims a few days prior. The trial was continued that day and finally took place on February 22, 2011.

■ Appellant claims that the Commonwealth failed to provide, through its bills of particulars, specific information about the crimes with which he was charged. It seems that Appellant's claim is twofold. First, he claims the information provided in the bills of particulars was insufficient to identify the victims of each specific crime for which Appellant was charged. Second, he claims the bills of particulars failed to state the date, time, and location of each specific offense. According to Appellant, this amounted to reversible error because it deprived him of due process under the United States and Kentucky constitutions.[2]

■ Criminal Rule 6.22 governs when a bill of particulars is required or may be sought and the proper procedure for obtaining one, but it does not address the information that a bill of particulars must contain.[3] Generally, "[t]he function of the Bill of Particulars in a criminal case is to provide information *fairly necessary* to enable the accused to understand and prepare his defense against the charges without prejudicial surprise upon trial." *Wolbrecht v. Commonwealth*, 955 S.W.2d 533, 538 (Ky.1997) (emphasis added). The question for this Court is whether, "when the indictment is considered along with the bill of particulars," the two "state the

---

**2.** Appellant spends a great deal of his argument claiming that this error was a so-called structural error. Although he admits that most constitutional errors are trial errors subject to a harmless error analysis, he correctly asserts that some constitutional errors are so fundamentally prejudicial as to amount to "structural error" that is not subject to the harmless error analysis. However, before this Court will address this distinction as it may apply to a due-process notice error, it must first decide whether there even was an

error, i.e., that the information the Commonwealth provided in its bills of particulars was so lacking as to amount to inadequate notice.

**3.** RCr 6.22 states: "The court for cause shall direct the filing of a bill of particulars. A motion for such bill may be made at any time prior to arraignment, or thereafter in the discretion of the court. A bill of particulars may be amended at any time subject to such conditions as justice requires."

acts constituting the offense in such a manner as to enable a person of common understanding to know what is intended." *Brown v. Commonwealth,* 378 S.W.2d 608, 610 (Ky.1964), *overruled in part on other grounds by Payne v. Commonwealth,* 656 S.W.2d 719 (Ky.1983).

Contrary to Appellant's claim that the Commonwealth did not provide the identity of the victims and engaged in "foot-dragging," Appellant had notice of the identity of each victim well in advance of trial. As of April 2010, approximately ten months before his trial, Appellant had notice of the identity of the victims of each of the crimes for which he had been indicted except for two charges, first-degree rape and complicity to commit rape. As mentioned above, the grand jury indictment identified the victims "K.A.T." and "K.S.T." and the Commonwealth's bill of particulars on April 8, 2010, included an attached police report that identified each of the victims by first, middle, and last names and included summaries of the statements that each victim had made. Thus, ten months before trial, Appellant knew or should have known the identity of the victims of the thirty-three counts of first-degree sexual abuse for which he had been charged. Additionally, Appellant received the specific notice he requested in January 2011, approximately one month before the trial was actually held, when the Commonwealth enumerated the specific charges and the corresponding victim.

The notice of the victims' identities given to Appellant ten months before his trial was likely adequate by itself, since it gave him sufficient information to distinguish between the two sets of initials which were used in the indictment and other documents. But even if that was not enough, the Commonwealth's specific response a month before trial was actually held was definitely enough. That this notice was given on the date trial had been scheduled is of no consequence, since the trial was not held that day.

■ Appellant also complains that he was not provided the identity of the victims of either the first-degree rape or the complicity to first-degree rape charges until the disclosures in January 2011. This issue is mooted by the fact that Appellant was neither tried nor convicted of these offenses and therefore no error could have occurred.

The second part of Appellant's argument is that the Commonwealth's bills of particulars did not provide the exact date, time, and location that each of the offenses occurred. The Commonwealth admitted in its September 2010 bill of particulars that because the events occurred between ten and fourteen years prior, it was nearly impossible to determine the specific dates and times the offenses occurred. The grand jury indictment stated that the offenses occurred between 1990 and 1998. The Commonwealth in January 2011, almost a month before trial, narrowed the timeframe to between 1995 and 1997 as to K.A.T. and "prior to [September 12, 1998]" as to K.S.T. This timeframe was established immediately after conducting additional interviews with the victims.

Appellant also contends that he did not have adequate notice of the location where the offenses occurred. The grand jury indictment described the location as being Hart County, Kentucky. In its September 2010 bill of particulars, the Commonwealth described the location as being "[Kenny and Patricia] Buster's home in Munfordville (white house, other side of the river)." After the aforementioned interviews in January 2011, the Commonwealth provided Appellant information that the offenses against K.A.T. occurred at Rodney Hayes' trailer on Jaggers Lane in Munfordville and that the offenses against K.S.T. oc-

curred "at the white house on Walton Lane in Munfordville."

This Court's predecessor in *Deskins v. Commonwealth*, 512 S.W.2d 520 (Ky.1974), examined the question of whether a bill of particulars that failed to disclose precisely when and where the defendant was alleged to have conspired to commit murder was insufficient. In holding that the bill of particulars was sufficient, the Court stated that "it is clear that the Commonwealth sufficiently complied with Deskins' motion for a bill of particulars *by giving all the information available.*" *Id.* at 524 (emphasis added).

In *Commonwealth v. Welch*, 243 S.W.2d 909 (Ky.1951), the Court reversed a trial court's decision that a bill of particulars was insufficient and stated that "[a]ll that is required is an honest effort on the part of the prosecution to obtain and give to the defendant all the necessary information that it reasonably can to enable him to know, as far as possible, the act or acts relied upon by the prosecution for a conviction." *Id.* at 911.

While Appellant's brief accuses the Commonwealth of "foot-dragging," "red herring waving," "flip-flopping," "rope-a-doping," "keeping defendant on the ropes of uncertainty," and "concealing vital information," it fails to point out any specific instance where the Commonwealth did not provide *all the information available* at the time when it responded to each request for a bill of particulars. Moreover, Appellant has not indicated precise instances where he was prejudicially surprised during trial. *See Violett v. Commonwealth*, 907 S.W.2d 773, 776 (Ky.1995) (holding that because appellant did not complain of any specific unfair surprise caused by the bill of particulars, he did not adequately establish how a more complete bill of particulars would have provided more adequate notice).

■ Additionally, Appellant's argument that the Commonwealth concealed information from him prior to trial is weakened by the fact that, at a pretrial conference exactly one week before trial, he was asked "are there any outstanding discovery matters or anything that needs to be addressed prior to this trial?" Appellant's counsel responded unequivocally that he did not think there were any other matters of concern to the Appellant. Thus, Appellant likely waived his right to an additional bill of particulars by not renewing his motion and by not continuing to argue for a more specific bill of particulars. *See Dunn v. Commonwealth*, 360 S.W.3d 751, 760 (Ky.2012).[4]

Because Appellant was provided fair notice of the charges against him, including the identity of the victims and the date,

---

**4.** Appellant's brief attempts to justify the failure to object at this pretrial conference, thus admitting that the issue might not be preserved for appeal, under the theory that making such an objection would have been futile. Appellant cites *Commonwealth v. Davis*, 14 S.W.3d 9 (Ky.1999), for the proposition that a defendant is not required to make useless objections. In *Davis*, however, the issue was whether a defendant received ineffective assistance of counsel when his lawyer failed to object to jury instructions that were not erroneous. *Id.* at 11. The Court held that objecting to proper jury instructions would have been futile because such an objection was certain to be overruled. *Id.* The Appellant in this case has not explained why making such an objection would have been futile. He has not demonstrated that the trial court would have certainly overruled such a motion. In fact, the record in this case demonstrates that the trial court was lenient throughout the process in granting motions for continuance and motions for bills of particulars. Thus, it seems clear that if the Appellant had a bona fide problem with the information he had received to that point, he should have objected at this conference and should have requested more discovery.

time, and location of the offenses, this Court holds that he was not deprived of his due-process rights under the United States or Kentucky constitutions.

**B. The trial court did not err in denying Appellant's motion for a directed verdict.**

Appellant claims that the trial court erred in denying his motion for a directed verdict. Appellant's argument focuses on the testimony of the two victims. He claims that too much time had passed since the abuse and that the two victims were too young at the time of the abuse for their testimony to be reliable. On appeal, the standard for determining whether a trial court erred in denying a defendant's motion for a directed verdict is whether, considering the evidence as a whole and drawing all reasonable inferences in favor of the Commonwealth, "it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky.1991).

Appellant urges the Court that its holding in *Coney Island Co. v. Brown*, 290 Ky. 750, 162 S.W.2d 785 (1942), should apply to this case. In *Coney Island*, the Court determined that while "[i]t is . . . ordinarily the function of a jury to determine the weight and effectiveness of the evidence," there is an exception when witness testimony is "so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value." *Id.* at 787–88. Appellant contends that the witnesses' testimony in this case was so incredible and improbable because the victims were young girls at the time of the abuse and that a substantial amount of time had passed. Therefore, Appellant argues that the directed verdict

should have been granted because it would be clearly unreasonable for a jury to find guilt.

*Coney Island*, however, stands only for the proposition that an appellate court should revisit a trial court's directed verdict decision supported by testimony only when the testimony describes events that are impossible. Indeed, the Court acknowledged that appellate courts should only reverse factual jury determinations "as an emergency expedient, for the correction of verdicts palpably wrong," and reversed only because the plaintiff's "theory was destroyed by the physical facts and the unchangeable law of nature." *Id.* at 788. More recently, this Court has stated that when a verdict depends on questions of a witness's credibility, rather than compliance with immutable laws of nature, *Coney Island*'s rule does not apply and a directed verdict is inappropriate. *See Potts v. Commonwealth*, 172 S.W.3d 345, 350–51 (Ky.2005).

The Court's holding in *Coney Island*, therefore, is inapplicable in this case. Here, there is not an issue of whether the victims' testimony reflects a factually impossible scenario. The victims testified with particularity as to the Appellant's identity and each demonstrated an ability to distinguish the Appellant from other possible perpetrators.[5] The victims also described with particularity the events, including the specific sexual acts, the exact locations where the abuse occurred, and other specific circumstances surrounding the events. Moreover, the Appellant was given the opportunity to cross-examine the victims in order to impeach their credibility. Yet, based on the testimony and other

5. Importantly, Appellant was one of a few men accused by the two alleged victims of sexual abuse. Appellant's counsel questioned the ability of the two alleged victims to accurately distinguish between the men, but their testimony demonstrated that they apparently could distinguish, based on their own memory, between all of the accused persons.

evidence introduced in the case, the jury evaluated the victims' credibility and found the Appellant guilty. Absent exceptional circumstances such as factual impossibility, it is precisely the jury's role to do so. Moreover, given the victims' testimony, it would not have been unreasonable for the jury to find Appellant guilty. Thus, this Court holds that the trial court did not err in denying Appellant's motion for a directed verdict.

**C. The trial court erred in trying to retain jurisdiction until Appellant's release to determine whether court costs and partial public-defender fees should be imposed.**

■ Appellant contends that the trial court erred when it ordered that "upon Defendant's release, the [trial court] shall determine whether the Defendant is capable of paying court costs and the partial public-defender fee of $200.00." In essence, the trial court's judgment granted itself "continuing jurisdiction," or more appropriately "returning jurisdiction," to re-examine the question of the Appellant's indigence after his release from prison at the end of his twenty-year sentence.

■ Appellant's first contention is that this order is a nullity because Appellant is indigent, and therefore is not required to pay either court costs or public defender recoupment fees. While this Court has recently addressed whether a defendant's indigent status waives the requirement to pay court costs and public-defender fees, *see Maynes v. Commonwealth,* 361 S.W.3d 922 (Ky.2012), the Appellant's contention need not be addressed here because the

trial court may not retain jurisdiction to make such a determination at the time of Appellant's release.[6]

■ Of course, there are statutes in Kentucky that specifically grant a trial court continuing jurisdiction over a particular case after a final judgment has been entered, such as in child custody, child support, and certain probationary matters. Absent such statutory empowerment, however, a trial court is generally stripped of its jurisdiction ten days after the entry of its judgment, when the time for filing a motion for a new trial has run. See *Prater v. Commonwealth,* 82 S.W.3d 898, 906 (Ky. 2002).

The statutes concerning payment of court costs by a convicted defendant suggest that the trial court is to make all such determinations in its final judgment. Court costs are to be taxed "upon conviction." KRS 23A.205(2). They are "mandatory" and not subject to any type of "nonimposition," unless the defendant is a "poor person as defined by KRS 453.190(2)" and "is unable to pay court costs and will be unable to pay the court costs in the foreseeable future." KRS 23A.205(2). Further, the statute permits a court to find that a defendant is not a "poor person" but is "unable to pay the full amount of the court costs and fees at the time of sentencing." KRS 23A.205(3). In such circumstances, the court may set up a payment plan with all payments to be made within one year of sentencing. *Id.* Thus, KRS 23A.205 contemplates three distinct and mutually exclusive classifications of persons: (1) those who are able to

---

**6.** While a thorough examination of *Maynes* is unnecessary in this case, *Maynes* does suggest that the imposition of court costs in Appellant's case would nevertheless have been inappropriate. In *Maynes,* the Court stated that "[w]ithout some reasonable basis for believing that the defendant can or will soon be

able to pay, the imposition of court costs is indeed improper." 361 S.W.3d 922, 930 (Ky. 2012). Thus, the determination of court costs is to be made at the time of the judgment looking forward, rather than at a later time, such as the defendant's release from prison.

pay their costs, (2) "poor persons" who are not required to pay court costs at all, and (3) those who are not "poor persons," yet nevertheless cannot pay immediately and are entitled to enter into a payment plan.

The statute does not expressly state when costs must be imposed under the first category, though "upon conviction" suggests at or near the time of conviction, or when the determination is made whether a defendant is a "poor person" under the second category. But the statute clearly lays out at what point the determination of whether and how court costs are to be paid by a person who is not a "poor person," but nevertheless cannot pay immediately—a determination that must be made "at the time of sentencing." KRS 23A.205(3). The statute says that the costs must be paid within one year "of the date of sentencing." *Id.*

Thus, while KRS 23A.205(2) is silent about when the determination of "poor person" is to be made, it follows that all determinations related to whether and how a defendant will pay court costs must be made by or at the time of sentencing. If the determination as to whether a person falls into the third category must be made at sentencing, then clearly the determination of whether someone must pay court costs in a lump sum or is a "poor person" who is not obligated to pay court costs at all must also be made by or at the time of sentencing.

■■■ Thus this Court concludes that the decision to impose or waive court costs is to be made by the trial court by or at the time of sentencing. There is no statutory basis for a court to exercise jurisdiction to determine the appropriateness of court costs beyond the end of the proceedings, much less once the sentence has been imposed and served and the defendant has been released from prison.

■■■ As to the partial public-defender fee, KRS 31.211 requires that the determination of whether a defendant may be compelled to partially repay public-defender fees first be made "at arraignment" and then also "at all stages of the proceedings." KRS 31.211(1). The statute contemplates the possibility that a defendant's economic condition may change throughout the proceedings and that a defendant may become able or unable to pay a portion of his public-defender fees. However, the statute does not empower the trial court to make such a determination after the proceedings have ended and the defendant is convicted and sentenced. Like the decision whether and how to impose court costs, whether a partial public-defender fee should be assessed must be done by or at sentencing, and may not be put off until after the defendant has served his sentence.

This reading of both sets of statutes is further supported by the compelling interest in the finality of judgments, which "is central to our legal system," *Bolin v. T & T Mining,* 231 S.W.3d 130, 133 (Ky.2007), and "axiomatic," *Baze v. Commonwealth,* 276 S.W.3d 761, 768 (Ky.2008). Part of this interest is the push toward finality, toward ending litigation. Thus, the policy of this Commonwealth is "that all litigation must come to an end." *McHargue v. Sizemore,* 438 S.W.2d 338 (Ky.1969). To allow a circuit court to leave a judgment open for as long as twenty years, without specific statutory authorization, would undermine this policy.

Because the pertinent statutes do not empower the trial court to retain jurisdiction to determine whether Appellant can pay court costs and partial public-defender fees until after Appellant has completed his sentence, the trial court erred in trying to leave its judgment open. In essence, the court would not have jurisdiction to

make such a determination after Appellant completed his sentence. We therefore reverse the portion of the trial court's judgment regarding court costs and fees.

The only remaining question is whether this case needs to be remanded for further proceedings.

 Because court costs are mandatory and not subject to any "nonimposition," absent certain statutory findings, that portion of the case must be remanded to the trial court to determine whether Appellant was entitled to the exemption from costs at the time of his conviction. If so, then he shall be exempt from paying court costs; if not, then the judgment must be corrected to impose court costs.

Partial public-defender fees are different in that they are not mandatory absent an exemption. The presumption for such fees is that an indigent defendant, which Appellant was since he received a public defender, does not have to pay them. However, at arraignment and "each stage of the proceedings," the trial court "shall ... determine whether a person who has requested a public defender is able to pay a partial fee for legal representation, the other necessary services and facilities of representation, and court costs." KRS 31.211(1).[7] Thus, while the fee is not mandatory, the determination whether the defendant can pay the fee is, and if the person can pay the fee, then "[t]he court shall order payment in an amount determined by the court and may order that the payment be made in a lump sum or by installment payments to recover money for representation provided under this chapter." *Id.* Because this determination is mandatory and its outcome could result in a required payment, the issue of whether Appellant could pay a partial fee

at the time of his conviction must also be considered on remand.

### III. Conclusion

For the foregoing reasons, Appellant's convictions are affirmed in their entirety. The portion of the trial court's judgment imposing court costs and fees, however, is reversed and this case is remanded for further proceedings consistent with this opinion.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT and VENTERS, JJ., concur. SCHRODER, J., not sitting.

---

7. That this section mentions the defendant's ability to pay court costs further underscores that the determination as to the partial public-defender fee is required.